UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                                 Criminal No. 11-cr-173/01-JL
                                        Opinion No. 2012 DNH 187

Jonathan Tanguay

## MEMORANDUM ORDER

This case, where the defendant moves to suppress evidence found by police executing a warrant to search his home, raises questions over the application of Franks v. Delaware, 438 U.S. 154 (1978). Tanguay argues that, in securing the warrant--which was based on a witness's claim to have seen child pornography on Tanguay's computer--a state police sergeant deliberately or recklessly omitted several material facts going to the witness's credibility and, ultimately, negating any probable cause. This court held an evidentiary hearing on Tanguay's motion, at which the state trooper who obtained the warrant, Lieutenant Carrie Nolet, was the only witness to testify.

As discussed infra, one of the facts (but not the only one) that Lieutenant Nolet omitted from the warrant application was that the witness had been convicted on a felony falsification charge, and her testimony at the hearing left no doubt that she did so recklessly, if not intentionally. Despite this serious misconduct, however, Lieutenant Nolet's warrant application would

have demonstrated probable cause to search Tanguay's computer for child pornography, even if the witness's felony falsification conviction, and other facts that Lieutenant Nolet recklessly or intentionally omitted, had been included.  So, as fully explained below, Tanguay's motion to suppress is denied.

**I.   <u>Background</u>**

**A.   The psuedonymous tip**

On February 2, 2010, Sergeant Alan Broyer of the Conway Police Department received a email from a sender identified as "Jim Garrold" at the address snales356@yahoo.com.  The sender stated that he was uneasy about "what [he] saw about three days ago" at the home of another person, whom the sender identified as a member of the local volunteer ambulance corps named "John Tanguway."  The sender explained that he had gone to this person's home "to have intercourse with him, and well before anything happened he was watching porn on his laptop."  The email stated that "Tanguway" possessed "a lot of child pornography on his laptop of little boys engaging in sexual acts" and that he spoke of his sexual desire for boys as young as nine.

The sender of the email related that, while he was "unsure [at] first about saying anything," he subsequently "spoke to [his] boss about it," and his boss encouraged him to take action, given the access that "Tanguway" could have to children in his

job as an emergency medical technician.  Thus, the sender stated, "if you have any questions or would like to talk further, I would be more than happy to tell you, but at the same time I would also like to remain annommous [*sic*]."  The sender concluded the email by giving his phone number.

After receiving this message, the police identified "John Tanguway" as Jonathan Tanguay, a selectman in the Town of Bartlett.  Perceiving a potential conflict of interest, the local police department referred the case to Troop E of the New Hampshire State Police, where, at the time, Lieutenant Nolet was a detective sergeant, responsible for overseeing felony investigations and supervising other detectives.  Lieutenant Nolet explained that, while she would not ordinarily have investigated such a case herself, her troop's "resident expert" had recently been transferred and she had no other detectives available.

Lieutenant Nolet, has since become the Troop E commander, and has more than 19 years experience with the state police, starting as a patrol officer and spending approximately 12 years as a detective sergeant.  She holds a degree in industrial engineering from Worcester Polytechnic Institute and held the rank of major in the United States Army Reserves, where, among other assignments, she was deployed as a company commander.

3

**B.    The tipster's identity and background**

After hearing from the Bartlett Chief of Police, Lieutenant
Nolet checked the name used by the sender of the email, "Jim
Garrold," but it did not appear in the state motor vehicle
records.  She then called the phone number given in the email,
reaching a voicemail greeting that gave the name "Josh Wiggin."
In light of this discrepancy, Lieutenant Nolet contacted Sergeant
Broyer, who had initially received the email, to ask whether he
knew anyone by that name.  Broyer did, and, before Lieutenant
Nolet submitted the warrant application at issue here, she spoke
with both him and another Conway Police officer about Wiggin.

In an affidavit submitted to this court in response to the
motion to suppress, Lieutenant Nolet relates that Sergeant Broyer
told her that "Wiggin was known to the Conway Police Department
as 'quirky' and a 'troubled teen' . . . .  Wiggin had in the past
suffered seizures, been suicidal and was having trouble 'finding
himself.'"  Lieutenant Nolet did not ask Sergeant Broyer what he
meant by "troubled" or "quirky."  Wiggin was by now 29 years old.

Either Sergeant Broyer or the other Conway Officer told
Lieutenant Nolet that Wiggin was, in that officer's words, a
"police groupie" who had applied for a job as an officer several
times but was unable to pass the physical agility portion of the
examination.  Lieutenant Nolet acknowledged at the hearing that,
as she understood the term, a "police groupie" is a person who

4

wants to spend time around the police and get in their good graces.  She also explained, however, that she did not give the term much weight when she first heard it used to describe Wiggin.

Sergeant Broyer also told Lieutenant Nolet that Wiggin had experienced "a few scrapes" with the Conway Police Department in the past.  Sergeant Broyer said that Wiggin had been convicted in the Carroll County Superior Court of uttering a false prescription for Vicodin by altering the quantity of pills from 30 to 80.[1]  As Lieutenant Nolet was aware at the time, this is a felony under New Hampshire law.  See N.H. Rev. Stat. Ann. § 318-B:2, VIII.  Sergeant Broyer also told Lieutenant Nolet that, when the police confronted Wiggin about the prescription, he "immediately confessed his guilt" to the charge.  Lieutenant Nolet did not ask Sergeant Broyer when Wiggin's conviction, or the underlying conduct, had occurred.  Nor did Lieutenant Nolet ask Sergeant Broyer about any of Wiggin's other "scrapes" with the Conway Police Department.  Lieutenant Nolet claims to have been unaware of any other criminal activity by Wiggin at the time she concluded her conversations with the Conway officers.

---

[1]Under cross-examination at the hearing, Lieutenant Nolet testified--in contradiction of the affidavit she submitted in response to the motion to suppress--that Broyer had not identified the court where Wiggin had been convicted, and that she had not learned that detail until after she applied for the search warrant.

As it turns out, Wiggin had convictions for other offenses, including simple assault (in 2001), misusing an emergency vehicle (in 2003), and bail jumping (also in 2003, but arising out of a separate incident).  He had also been charged with receiving stolen property (in 1998), shoplifting (in 1999), and felonious sexual assault (in 2001), though all of these charges were ultimately dismissed.  Aside from the felonious sexual assault charge, which was brought in the Carroll County Superior Court, all of the charges against were brought in the Conway District Court (now the Third Circuit Court, Conway Division) and had originated with the Conway Police Department.  There is no evidence that Lieutenant Nolet knew about any of these various items of Wiggin's criminal history when she applied for the warrant.  Again, Lieutenant Nolet never asked Sergeant Broyer what he meant when he said Wiggin had experienced "a few scrapes" with the Conway Police.  She also did not perform a criminal records check on Wiggin.

Wiggin had also been charged in a juvenile petition in 1998, when he was 16 years old, with making a false report to law enforcement.  Wiggin reported that he had been outside his parents' house when he heard a gunshot from across a nearby wetland area and then felt pain in his leg, where he had suffered three pellet wounds.  The Conway Police responded by, among other things, setting up a perimeter around the scene, blocking traffic

6

along the adjacent roadway, and calling in a canine unit to search the area.  In total, some 10 different officers were involved (including, for some 90 minutes following Wiggin's report of the shooting, the entirety of the Conway Police Department).  As they investigated the scene, however, the police began to suspect that Wiggin had shot himself.  Asked about this during a police interview at the hospital, where he had been taken for treatment, Wiggin initially denied it, then admitted that he had shot himself in the leg four times with a pellet gun "to see what it would feel like."

During this time, Lieutenant Nolet was serving as a state trooper for Belknap and Carroll Counties.  A police report of the incident states that she was among the officers who reported to the scene of the shooting.  Lieutenant Nolet testified that she did not remember the incident, though she acknowledged that reports of shootings necessitating a police perimeter and canine search are not very common.[2]  She also testified that she did not know the claimed victim had shot himself, though that fact was reported on the front page of the local Conway newspaper the next day, in an article that identified Wiggin by name.

_____

[2]Lieutenant Nolet suggested that the report she was there might have been mistaken because "the officer who wrote the report is no longer employed" due to "credibility issues."  As it turns out, the officer who Lieutenant Nolet identified as having been dismissed for "credibility issues" was not the one who wrote the report.

In any event, after talking to the Conway Police about
Wiggin, Lieutenant Nolet confirmed that he lived at his parents'
house, and went there to speak with him.  As a result of this
visit, Wiggin called Lieutenant Nolet and confirmed that he was
the one who had sent the email about Tanguay.  Wiggin also agreed
to submit to a formal recorded interview with Lieutenant Nolet,
though he said that he was embarrassed to reveal his planned
liaison with Tanguay because his parents, his girlfriend, and his
boss did not know about it, nor, Wiggin said, did they know about
his homosexual activity.[3]  Lieutenant Nolet told Wiggin that,
before coming in for the interview, he should write down anything
relevant so as not to forget it.

**C.   The interview**

Lieutenant Nolet, together with an investigator from the
state Attorney General's office, interviewed Wiggin at the Troop
E barracks on February 10, 2010.  Lieutenant Nolet believed at
that point that the Attorney General's office would be taking
over the investigation, with the State Police merely assisting.

---

[3]As already discussed, Wiggin had stated in the email that
he had told his boss about what he had seen at Tanguay's house,
and that it was Wiggin's boss who had persuaded him to report it
to the police, in light of Tanguay's job as an EMT.  So, while
Wiggin's boss may not have known about Wiggin's sexual
relationship with Tanguay, Wiggin must have told his boss, at a
minimum, that he (Wiggin) somehow had occasion to be shown
possible child pornography by Tanguay.

Lieutenant Nolet took notes during the interview, which was also recorded and, later, transcribed.  Wiggin brought a typewritten note to the interview with him.

During the interview, Wiggin stated that he had sent the email inculpating Tanguay under a false name because he feared that "the police department would come back on" him for reporting a local EMT.  Wiggin did not repeat his claim that he had sought anonymity because he did not want his parents, girlfriend, and boss to learn of his homosexual activity, and he was not asked about that during the interview.

Wiggin recalled that he had first met Tanguay while he was a counselor at a summer camp that Wiggin attended in fourth or fifth grade, and noticed Tanguay, who was in his late teens at the time, observing Wiggin and other boys while they showered. Wiggin further recalled that later, when he was 16, he had one or more sexual encounters with Tanguay, who at that time worked at Wiggin's high school.  Tanguay had no further contact with Wiggin until two years or so after he graduated high school, when Tanguay called Wiggin and asked to meet.  This marked the beginning of an occasional sexual relationship between the men.

During this relationship, Tanguay had, a few times, invited Wiggin over to Tanguay's house, which Wiggin said was on Hurricane Mountain Road in Bartlett.  Upon arriving at the home on one of these occasions, in late January 2010, Wiggin recalled,

9

Tanguay was sitting unclothed on a couch, facing the fireplace, with a copper-colored laptop computer open on the table in front of him.  Wiggin recalled that Tanguay was "watching some, I, I guess maybe child pornography um, videos, um, they looked too young to be somebody that might have been eighteen."  Wiggin explained that "there wasn't really much of any, any signs I guess, [of] body hair, or facial hair and you know, I mean you can, you can tell when you look at ah, a[n] eighteen year old versus you know, a fourteen year old."

Asked for more detail by the state police investigator, Wiggin stated, "well, um, there was I don't know, a bunch of what looked like a bunch of minors"--"boys"--engaging in oral sex and intercourse with each other.  Asked, "what would you describe their ages to be if you had to[?]" Wiggin responded, "I don't know maybe eight, thirteen, fifteen, sixteen."  In the note Wiggin had brought to the interview with him, Wiggin had written that, when he went over to Tanguay's house, Wiggin saw "his laptop open and he was viewing either young men or teen pornography on his computer."

Wiggin further recalled that, after a brief conversation about recent goings-on in his life, Tanguay closed the video that had been playing and said, "this is pretty neat[,] you wanna check this one out[?]"  Tanguay then opened the "My Pictures" folder, causing the appearance of what Wiggin described as "a

bunch of pictures on his computer of you could definitely tell
they were you know, younger than teens." Wiggin said that he
"didn't get a very good look" or even "much of a glimpse" at
these images before Tanguay said "oop[s] wrong one" and "closed
out of it really quick."

Tanguay then opened the "My Videos" file on the computer.
This displayed, according to Wiggin, "a whole roll on the bottom
of the screen probably I don't know, three, four um, videos that
were you know, kids engaging in sex, and it, it only showed you
know, a glimpse . . . like a picture of what the video was
about," or a "thumbnail." Wiggin stated, "you could definitely
tell it was you know, a[n] eight or nine year old um, and it
looked like the eight or nine year old was having you know,
giving oral to an adult." Tanguay did not, however "click on the
very, the ones of the kids that looked really young," but instead
showed Wiggin "a couple" of videos of intercourse between males
of "between maybe seventeen and twenty."

Wiggin also recalled that Tanguay made "a lot of comments
saying that you know, gee, if I had the chance I would have sex
with ha, you know, a nine year old . . . the thing that bothered
me the most is he said, you know, how, how about your
girlfriend's son, how old is he[?]" Wiggin said he answered
that, while his girlfriend's son was nine, that was "really none
of [Tanguay's] business." Tanguay then went on to ask Wiggin

11

about the time he spent with his girlfriend's son and that, when
Wiggin explained that they spent that time doing puzzles or
playing video games, Tanguay said, "yeah, but I'd bet you'd like
to do more with him, wouldn't you[?]"  Wiggin said that he
expressed disgust at that suggestion and, after Tanguay
reiterated his own sexual desire for young boys, Wiggin left.

Wiggin claimed that this was the first time that Tanguay had
"watched videos like this or had that kind of discussion" with
him.  Referring to his notes later in the interview, however,
Wiggin stated that Tanguay "talks about having sex with minors
all the time" and that he "asks [Wiggin] all the time [hey] well
why don't you bring, why don't you bring your girlfriend's son
over here[?]"  In any event, Wiggin said he had not been in
contact with Tanguay since the evening he had shown Wiggin the
video, aside from a couple of text and instant messages from
Tanguay to which Wiggin had not responded.  In light of Tanguay's
comments on that evening, Wiggin said, he could not "feel at ease
until this guy gets help or . . . something needs to be done."
Wiggin added that, if the police searched Tanguay's digital
camera, they would "probably" find a few pictures of Wiggin
performing oral sex on Tanguay.

Wiggin also said during the interview that his mother, who
frequently had occasion to deal with Tanguay during her work at a
local hospital, "doesn't like him just because of the attitude he

gives off," and that Tanguay's "trying to act like he's her friend . . . absolutely infuriates" Wiggin's parents.  In fact, Wiggin said during the interview that, when using the local ambulance service to transport his elderly grandparents, his parents "always will call the ambulance service and say, we do not want Jon Tanguay on our property."

Three days after the interview, when Lieutenant Nolet called Wiggin to obtain Tanguay's email address, Wiggin explained that Tanguay had only a screen name that he used for instant messaging (though Wiggin also provided Tanguay's cell phone number). Lieutenant Nolet then conducted an on-line search of the screen name, finding some photographs of both Tanguay and his home that had been posted.  After the interview, Lieutenant Nolet obtained a photograph of Tanguay from motor vehicle records and confirmed that he lived on Hurricane Mountain Road.  She did not do any further investigation.

**D.   The warrant application**

Lieutenant Nolet recalls that "at some point somebody decided that [she] was going to be the affiant" for a search warrant for Tanguay's laptop and other materials.  She explained that she had been expecting the investigator from the Attorney General's office to serve as the affiant, "since she was the lead in the interview."  While Lieutenant Nolet had served as the

affiant in support of a search warrant "a few dozens [of] times" earlier in her career, she testified that this was the only time in the past five or six years that she had done so.  In any event, Lieutenant Nolet started typing an affidavit "as fast as [she] could based upon [her] notes" of the interview with Wiggin because, she explained, she "was concerned with the destruction of evidence at that point should [] Tanguay find out that we were investigating the matter."

Lieutenant Nolet filed her affidavit in support of the search warrant with the then-designated Northern Carroll County District Court on February 18, 2010, eight days after she interviewed Wiggin.  In the affidavit, Lieutenant Nolet explained how she learned about the email from "Jim Garrold" to the Conway Police Department, which she attached, and that she had used the phone number from the email to locate Wiggin.  She stated that Wiggin confirmed he had sent the email wishing "to remain anonymous due to his parents and girlfriend not being aware of his lifestyle" but had agreed to a formal police interview "despite his embarrassment revealing to me his sexual relationship with Tanguay, which [Wiggin] has never disclosed to his parents, girlfriend, or boss."

After setting forth Wiggin's account of how he and Tanguay had met, commenced, and then broken off and resumed a casual

14

sexual relationship, and that Tanguay had invited Wiggin to his

home on a recent evening, the affidavit stated, in relevant part:

> Tanguay was naked on the couch, facing the fireplace,
> watching possible child pornography videos on his
> laptop computer.  Wiggin said the boys looked too young
> to be 18 because there wasn't [*sic*] any signs of body
> hair or facial hair, saying, "You can tell when you
> look at an 18 year old versus a 14 year old."  He
> described the content of the video as a bunch of minor
> boys in a group, maybe 8, 13, 15, and possibly 16 years
> of age.  They were engaging in both oral and sexual
> intercourse with each other.
>
> . . . .  Tanguay then closed the video he had been
> watching.  Wiggin described Tanguay as first going to
> the start menu and clicking on "My Pictures."  Tanguay
> opened it up and closed it quick saying, "Wrong one."
> Tanguay had a bunch of picture icons on the screen and
> Wiggin said based on what he saw that the males were
> younger than their teens.
>
> Tanguay then clicked on "My Videos."  Wiggin said there
> was a whole bottom row of thumbnails of different
> videos on the screen and there were 3 or 4 videos
> showing what he believed were kids engaging in sex.
> Wiggin said it showed only a glimpse, the top picture
> for the file of what the video was about (thumbnail).
> Wiggin described one video thumbnail shot as, "You
> could definitely tell it was an 8 or 9 year old.  It
> looked like he was giving oral sex to an adult."
> Wiggin said that Tanguay didn't click on the videos
> with the kids that looked really young.

The affidavit did not mention that, in the note Wiggin had made

and brought to the interview with him, he described the video

Tanguay had been watching when he arrived as "either young men or

teen pornography on his computer."

The affidavit related Wiggin's remarks that "it was

difficult to talk about, but . . . [the police] would probably

find pictures of him performing oral sex on Tanguay" and "what bothered [Wiggin] the most was that Tanguay had asked about Wiggin's girlfriend's son who is 9 years old and commented to Wiggin, 'I bet you'd like to do more with him, don't you[?]'" The affidavit also included Wiggin's statement that "this incident was the first time Tanguay shared videos and had that kind of discussion," but did not mention Wiggin's statements that Tanguay "talks about having sex with minors all the time" and "asks [him] all the time . . . why don't you bring your girlfriend's son over here[?]"  The affidavit concluded that Tanguay "did knowingly possess or control three or more visual representations of a child under the age of 18 engaging in sexually explicit conduct . . . there is probable cause to believe that the computer system or systems located at [Tanguay's home] address . . . does contain evidence of the crime of possession of child pornography."

The state district court issued the requested warrant to search, among other things, Tanguay's laptop.  The search allegedly revealed visual images of child pornography, and, in due course, Tanguay was indicted in this court on one count of possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B).

**E.    Omissions from the affidavit, and Lieutenant Nolet's explanations**

While Lieutenant Nolet stated in the affidavit that she had met with Sergeant Broyer of the Conway Police, she did not include any of the information he or the other Conway officer had provided about Wiggin.  Thus, the affidavit did not mention that "Wiggin was known to the Conway Police Department as 'quirky' and a 'troubled teen' . . . .  Wiggin had in the past suffered seizures, been suicidal and was having trouble 'finding himself.'"  The affidavit did not mention Sergeant Broyer's characterization of Wiggin as a "police groupie" or Sergeant Broyer's comment that Wiggin had "a few scrapes" with the Conway Police in the past.  Nor did the affidavit mention Wiggin's felony conviction for uttering a false prescription, of which Sergeant Broyer had also told Lieutenant Nolet.

In her affidavit to this court, submitted in response to the motion to suppress, Lieutenant Nolet explained that, when she applied for the search warrant, she "did not feel that the conviction for the false prescription was relevant in light of all the other factors which [she] felt made [] Wiggin a credible reporter."  She identified these factors as "his coming forward despite fear of retaliation and the fact that his heretofore private homosexual activity would be revealed."  Her affidavit to this court does not explain why she omitted Sergeant Broyer's

17

other comments about Wiggin, i.e., that he was "quirky" and "a police groupie" who, as a teenager, had been "troubled" and "suicidal."

Lieutenant Nolet also stated in her affidavit to this court:

> In preparing the [search warrant] affidavit, I did not consider [] Wiggin to be a confidential informant or a cooperating defendant.  To the contrary, I considered Wiggin to be an eyewitness to a crime and was not aware of any bias motivating Wiggin.  Wiggin's reason for using an alias [in the email] was plausible in light of the secrecy he maintained concerning his sexual orientation.  In considering the information provided by Wiggin, I was guided by the New Hampshire Attorney General's Law Enforcement Manual issued in June, 2008.  That manual directs that "the victim of a crime and eye witnesses are generally considered a reliable source of information about the crime being investigated.  Absent some indication the witness may not be telling the truth, such as the clear presence of bias, the police are not obligated to inquire into or to demonstrate the witness' credibility."

Lieutenant Nolet testified at the hearing that, based on this statement from the manual, the only time a warrant application needed to set forth "information about the credibility" of a source who is neither anonymous nor confidential is "[i]f there's any clear bias."  Lieutenant Nolet explained that she did not think Wiggin had such a bias because, as she stated in her affidavit to this court, "he had a lot to lose" by coming forward with the information about Tanguay, since neither Wiggin's family nor girlfriend knew about his homosexuality.  Lieutenant Nolet also perceived an absence of bias in Wiggin's statement during his interview that he "wanted

18

[Tanguay] to get help.  He didn't mention anything about wanting him to be charged, convicted, go to jail, anything like that."

Putting aside for the moment the faithfulness of this analysis to the guidance set forth in the Attorney General's manual, Lieutenant Nolet acknowledged at the hearing that she did not in fact look at the manual in preparing the application for the search warrant, but simply relied on her "experience with that manual."  Because this warrant application is the only one that Lieutenant Nolet has submitted in the past five or six years, however, it is unclear what "experience" she could have with the relevant guidance set forth in the version of the manual issued in June 2008, i.e., at least two years after she would have last had occasion to consult it.  While, as it turns out, the prior version of the manual, issued in 1993, contains a nearly identical statement to the one that Lieutenant Nolet identified as having "guided" her, the fact remains that Lieutenant Nolet stated in her affidavit to this court that she "was guided by the New Hampshire Attorney General's Law Enforcement Manual issued in June, 2008."

In any event, neither version of the manual supports Lieutenant Nolet's claimed understanding that the only time a warrant application needs to set forth "information about the credibility" of a source who is neither anonymous nor confidential is "[i]f there's any clear bias."  The manual states

19

that the police are relieved of demonstrating a witness's credibility "[a]bsent some indication the witness may not be telling the truth, <u>such as</u> the clear presence of bias" (emphasis added).  So Lieutenant Nolet patently misunderstood the manual-- to say nothing of well-established Fourth Amendment law, as discussed <u>infra</u>--to mean that bias, and only bias, serves to call a witness's account into question such that it cannot simply be taken at face value in establishing probable cause.

Furthermore, Wiggin did have clear reasons for bias against Tanguay, based on several different facts known to Lieutenant Nolet at the time she applied for the warrant.  First, Wiggin and Tanguay had been involved in a long-term, if casual, sexual relationship that Wiggin wanted to discontinue (because, he claimed, he had just discovered Tanguay's sexual attraction to children--though, as already discussed, Wiggin also stated that Tanguay "talks about having sex with minors all the time").  Second, Wiggin said that his parents, with whom he was living at the time, strongly disliked Tanguay and tried to avoid any involvement with him.

Third, Tanguay had made comments of a sexual nature about Wiggin's girlfriend's son that Wiggin found disgusting.  In fact, Lieutenant Nolet testified that, when Tanguay suggested that Wiggin might harbor sexual desire for the child, "at that point it made it personal for [Wiggin], and it may have been one of the

20

motivating factors to report." Lieutenant Nolet denied, however, that this would bias Wiggin against Tanguay, explaining, "bias is a slanting. If this in fact happened, it was just the truth." She elaborated that she does not "understand bias to mean the reason one would slant information" but, rather, "the actual act of twisting [or] slanting information in one direction." In other words, "bias is the act of deceiving, not a motive to deceive." In light of this understanding, Lieutenant Nolet testified, she read the guidance in the Attorney General's manual to mean that "if it's not clear to me that the witness is lying, slanting the truth, there's no reason to inquire further."

Indeed, Lieutenant Nolet's testimony revealed an astonishing depth of confusion over the basic concepts of witness "bias" and "credibility," particularly for an officer with her impressive background and experience. Asked whether she would include, in warrant application, the fact that the source of the incriminating information had five prior convictions for making false reports to law enforcement, Lieutenant Nolet answered, "Potentially. I may have if I felt there was a bias." She then explained that "five convictions in my mind would be some bias," i.e., "[b]ias against telling the truth." Next, upon questioning from the court, Lieutenant Nolet explained that she understood "bias" as "an intentional slant of information" and "credibility" as "the propensity for truthfulness"--but then stated that she

21

took five convictions for false reporting to indicate, again, "a
slant of information against telling the truth."

Lieutenant Nolet testified that, based on her understanding
of the Attorney General's manual, her warrant application did not
"need[] to address [Wiggins's] credibility at all."  Asked why
her application nevertheless included Wiggins's request for
anonymity lest his parents and girlfriend find out about his
lifestyle, however, Lieutenant Nolet answered that this
information "would show that he's got a lot to lose and wouldn't
be biased."  Lieutenant Nolet tried to explain this contradiction
based on the distinction she drew between bias and credibility.

Lieutenant Nolet also testified to reasons, aside from the
Attorney General's manual, that her warrant application did not
mention Wiggin's conviction for forging the prescription.  She
explained that she did not deem the conviction a reason to doubt
Wigggin's truthfulness at the time he provided the information
because "many years ago he was a troubled teen.  He's older now,
and I just didn't consider it relevant."  She acknowledged,
however, that, at the time she submitted the warrant application,
she did not know the date or age of Wiggin's conviction for
uttering a false prescription (again, she had not asked).
Lieutenant Nolet further explained, "I felt he had redeemed
himself . . . he confessed, as opposed to 95 percent of the
people that go to trial plead not guilty and they're found

22

guilty."  Lieutenant Nolet also stated that, based on her
"experience" with the judge from whom she sought the warrant, if
she "felt there was an omission, [she] would ask and make notes
at the bottom on the warrant."  Lieutenant Nolet was unable to
explain, though, how this judge--or any judge--could learn of
omitted facts omitted from a warrant application so as to ask
about them before deciding to issue a warrant.

## II.  **Analysis**

The Warrant Clause of the Fourth Amendment provides, in
relevant part, that "[n]o warrants shall issue, but upon probable
cause, supported by Oath or Affirmation."  U.S. Const. Am. IV.
In Franks, the Supreme Court observed that this demand for "a
factual showing sufficient to comprise probable cause" assumes
"there will be a truthful showing . . . in the sense that the
information put forth is believed or appropriately accepted by
the affiant as true."  438 U.S. at 164-165 (quotation marks
omitted).  Thus, where an affiant's "perjury or reckless
disregard is established by the defendant by a preponderance of
the evidence, and, with the affidavit's false material set to one
side, the affidavit's content is insufficient to establish
probable cause, the search warrant must be voided and the fruits
of the search excluded to the same extent as if probable cause
was lacking on the face of the affidavit."  Id. at 156.

This reasoning "logically extends, as lower courts have recognized, to material omissions" from the application. 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.4(b), at 543-45 (4th ed. 2004); see also, e.g., United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002); United States v. Charles, 213 F.3d 10, 23 (1st Cir. 2000).  In the case of an omission, "suppression should be ordered only if the warrant application, . . . clarified by disclosure of previously withheld material, no longer demonstrates probable cause." United States v. Stewart, 337 F.3d 103, 105 (1st Cir. 2003).

In moving to suppress the evidence allegedly discovered through the execution of the search warrant against him, Tanguay charges that Lieutenant Nolet intentionally or recklessly omitted facts from her warrant application, particularly (but not exclusively) the unflattering information as to Wiggin's background that she learned from the Conway Police.  When those facts are added in to the warrant application, Tanguay argues, it no longer demonstrates probable cause for the search, since that showing depends entirely on Wiggin's claim to have seen child pornography on Tanguay's computer.  For the reasons explained below, the court agrees that Lieutenant Nolet intentionally or recklessly omitted a number of material facts from the warrant application, but finds that, even when those facts are added, the application still demonstrates probable cause.

24

**A.   Lieutenant Nolet's omissions were intentional or reckless**

Because "'[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation . . . , every decision not to include certain information in the application is not 'intentional' insofar as it is made knowingly.'"  2 LaFave, supra, § 4.4(b), at 545 (quoting United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990)). Instead, "'Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate.'"  Id. at 546 (quoting Colkley, 899 F.2d at 301; see also United States v. Belton, 414 F. Supp. 2d 101, 111 (D.N.H. 2006) (citing additional cases), aff'd, 520 F.3d 80 (1st Cir. 2008).  The court of appeals has held that "'recklessness may be inferred where the information was critical to the probable cause determination,'" i.e., consisted of "'facts that any reasonable person would know that a judge would want to know when deciding whether to issue a warrant.'"  Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005) (quoting Golino v. New Haven, 950 F.2d 864, 871 (2d Cir. 1991) and Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000)); see also United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993) (finding that a warrant application recklessly omitted a fact where "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know").

25

By this standard, Lieutenant Nolet acted recklessly--if not intentionally--in omitting several pieces of information from the warrant application.  First, as the prosecution more or less conceded during argument at the suppression hearing, Wiggin's felony conviction for forging a prescription is unquestionably a fact that any reasonable officer would consider critical in deciding whether Wiggin's account established probable cause. That crime requires, as an essential element, the making or uttering of a false statement.  N.H. Rev. Stat. Ann. § 318-B:2, VIII.  Crimes of that nature have long been taken to suggest that those who commit them are not credible witnesses.  See Fed. R. Evid. 609(a)(2).  "Any crime involving dishonesty necessarily has an adverse effect on an informant's credibility."  United States v. Elliott, 322 F.3d 710, 716 (9th Cir. 2003); cf. United States v. Rumney, 867 F.2d 714, 720-21 (1st Cir. 1989) (rejecting Franks challenge based on omission of informant's crimes because they were not "ones involving perjury or false statements").

Moreover, Lieutenant Nolet admitted at the hearing that she intentionally omitted Wiggin's falsification conviction from the warrant application because, as she stated, "I just didn't consider it relevant."  The Supreme Court has identified "'[t]he point of the Fourth Amendment," particularly, the Warrant Clause, as "'requiring that . . . inferences be drawn by a neutral and detached magistrate instead of being judged by the officer

26

engaged in the often competitive enterprise of ferreting out crime.'" Wilson, 212 F.3d at 787 (quoting Johnson v. United States, 333 U.S. 10, 13-14 (1948)).  Thus, "[i]t follows that a police officer cannot make unilateral decisions about the materiality of information."  Id.

As the court of appeals has likewise cautioned, complying with the Fourth Amendment demands "more than an agent's own judgment as to the ultimate importance of a piece of information to a judgment of probable cause," so that, unless it is "so trivial, remote, or irrelevant that no reasonable official could assign it weight in coming to a decision to issue the warrant . . . , the information should be included."  Stewart, 337 F.3d at 107.  The felony falsification conviction of the witness upon whose account probable cause depends is not "trivial, remote, or irrelevant," and Lieutenant Nolet acted recklessly--at best--in deciding to keep that fact from the magistrate based on her own mistaken judgment to the contrary.[4]

---

[4]Lieutenant Nolet attempted to offer innocent explanations as to why she omitted the fact of Wiggin's felony falsification conviction from the application, but those explanations were unconvincing.  First, Lieutenant Nolet claimed that the conviction came from "many years ago"--but she admitted that she did not know the age or date of the conviction at the time she decided to leave it out of the application.  Second, Lieutenant Nolet said that Wiggin "had redeemed himself . . . he confessed, as opposed to 95 percent of the people that go to trial plead not guilty and they're found guilty."  Suffice it to say that the fact that a person admits to lying after getting caught does not change the fact that he lied (and the law on impeachment of

Second, any reasonable officer would also appreciate that a magistrate deciding whether to issue a search warrant based solely on Wiggin's account would want to know that the local police had told her he was "quirky," "a police groupie," "troubled" (in his teenage years), and "suicidal" (at some unspecified point in the past).  While Lieutenant Nolet strove during her testimony to lend a neutral (or, in the case of "police groupie," even a positive) characterization to these terms, any reasonable person would take them to reflect poorly on Wiggin's credibility.  The adjectives "quirky," "troubled," and "suicidal," especially when used in conjunction, readily suggest mental instability and, hence, untrustworthiness as a witness. See Stewart, 337 F.3d at 105-07 (criticizing "agents' inappropriate decisions to sanitize the information supplied to support [a] search warrant," including that one of the informants had been treated at a psychiatric facility); United States v. Meling, 47 F.3d 1546, 1554 (9th Cir. 1995) (ruling that agents had deliberately omitted material information concerning a source's credibility from a wiretap application, including his "history of mental illness").

In this context, moreover, any reasonable understanding of the term "police groupie" would have to embrace not simply

---

witnesses draws no distinction between crimen falsi convictions obtained by plea as opposed to those obtained at trial).

someone who admires the police and wants to associate with them, but someone who might be willing to compromise him or herself to do so.  Indeed, one strong indication that a reasonable officer would consider these aspects of Wiggin's personality to be of interest to someone assessing his credibility is that Sergeant Broyer chose to alert Lieutenant Nolet to them when she contacted the Conway Police to ask what they knew of Wiggin.

Third, a reasonable officer would have realized that a magistrate considering a search warrant for child pornography would have wanted to know that, in the note Wiggin had made himself and brought to his interview with Lieutenant Nolet, he had written that Tanguay was "viewing either young men or teen pornography on his computer" when Wiggin arrived.  This was the same video that Wiggin described during the interview as "what looked like a bunch of minors," aged between 8 and 16, engaged in sex acts.  As Lieutenant Nolet knew at the time, federal and New Hampshire child pornography laws apply only to depictions of people under age 18.  See 18 U.S.C. § 2256(1), N.H. Rev. Stat. Ann. § 649-A:2, I.  So, if the video showed "young men"--which is one way Wiggin described it in the note--then Tanguay's possession of the video would not be criminal, and would not furnish probable cause for the search.

"[A]n affiant must establish probable cause, based on the totality of the circumstances, that evidence of child pornography

depicting minors will be discovered at a particular location to secure a warrant to search that location." United States v. Syphers, 426 F.3d 461, 466 (1st Cir. 2005). It would be apparent to a reasonable officer, then, that a magistrate deciding whether there was probable cause to search Tanguay's computer for child pornography would want to know that the witness claiming to have seen it there had at one point called it "young men or teen pornography," even if, at a later point, he described the subjects in the video as teenaged or younger.[5]

Tanguay argues that Lieutenant Nolet recklessly omitted several other material facts from the warrant application, but it is considerably more difficult to call these pieces of information "facts that any reasonable person would know that a judge would want to know when deciding whether to issue a warrant." Burke, 405 F.3d at 82 (quotation marks omitted). These facts include:

---

[5]Tanguay also argues that Lieutenant Nolet recklessly omitted the fact that, according to the transcript of Wiggin's interview, he stated "I don't know maybe eight, thirteen, fifteen, sixteen" (emphasis added) when asked to describe the ages of the subjects of the video. But, at the time she prepared her warrant application, Lieutenant Nolet did not have access to the transcript (only to her notes, which have since been destroyed). In any event, the application states that Wiggin described the subjects of the video as "maybe 8, 13, 15, and possibly 16 years of age" (emphasis added), so it accurately expresses the equivocal nature of Wiggin's answer. This was not a reckless omission.

•that Wiggin brought notes with him to the interview (as opposed to the equivocation expressed in those notes as to the age of the subjects of the video, which, as just discussed, was recklessly omitted from the application);

•that Wiggin initially suggested in the interview that he was below the age of consent at the time of his first sexual encounter with Tanguay, only to acknowledge, in response to a question from the investigator, that he must have been 16;

• Wiggin's parents' animosity toward Tanguay; and

• Sergeant Broyer's comment to Lieutenant Nolet that Wiggin had "scrapes with the law."[6]

These facts qualify as "so trivial, remote, or irrelevant that no reasonable official could assign [them] weight in coming to a decision to issue the warrant." Stewart, 337 F.3d at 107. It is unremarkable that Wiggin brought notes to the interview, particularly after Lieutenant Nolet suggested that he make notes to aid his recollection.  The same is true of the fact that Wiggin did not at first precisely recall his age at the time of his first sexual encounter with Tanguay, which happened some 12

_____

[6]Tanguay also argues that the application omitted Wiggin's "inconsistencies about whether this was the first time he had learned about Tanguay's claimed interest in minors."  But Lieutenant Nolet's affidavit recited more or less verbatim Wiggin's statement that the recent incident was the first time Tanguay had "watched videos like this or had that kind of discussion"--referring to Tanguay's suggestion that Wiggin harbored a sexual desire for his girlfriend's minor son.  In relating that statement, and how it had disgusted him, Wiggin did not say that this was the first time that Tanguay had mentioned his own sexual interest in minors, so his statements later in the interview to the effect that Tanguay "talks about having sex with minors all the time" were not inconsistent.

or 13 years before the interview and was, in any event, far removed from Wiggin's recollection of his much more recent experience in seeing child pornography at Tanguay's home.  Cf. United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (ruling that witness's inconsistent statements as to a "tangential matter" did not seriously call his "chief assertion" establishing probable cause into doubt such that the inconsistencies were recklessly omitted).

While perhaps less defensible, Lieutenant Nolet's decision to leave out Wiggin's account of his parents' animosity toward Tanguay was also not reckless.  The court of appeals has rejected the view that "when an officer has knowledge of a 'bad relationship' between the person under suspicion and a witness to the alleged crime, that witness's credibility must be considered questionable."  Holder v. Town of Sandown, 585 F.3d 500, 505 (1st Cir. 2009); see also, e.g., United States v. Elliott, 893 F.2d 220, 224 (9th Cir. 1990) ("antagonism toward defendant may explain informant's motivation in providing the government with the tip, but it does not lessen his credibility") (bracketing and quotation marks omitted).[7]  It follows that antagonism toward the defendant by someone closely associated with the informant, such

---

[7]The considerably better practice, of course, is to include indications of a source's potential animosity toward a suspect in the warrant application.

as his parents, does not affect credibility to such a degree that
Lieutenant Nolet was reckless to exclude it from the warrant
application.  In any event, Lieutenant Nolet included in the
application other facts which, as already discussed, suggest
antagonism between Wiggin and Tanguay.  These included Wiggin's
reaction to Tanguay's suggestion that Wiggin harbored a sexual
desire for his girlfriend's young son, as well as the very fact
that Wiggin was inculpating a person with whom he had an amorous
relationship--a fact known to any experienced investigator as at
least a possible source of animosity--so it did not leave the
misimpression that the two were on good terms by any means.

Finally, the court of appeals has held that "[a] criminal
record, no matter how lengthy, does not necessarily impugn one's
veracity," unless, as already discussed, it includes convictions
for crimes of dishonesty.  Rumney, 867 F.2d at 720-21.  The fact
that the complaining witness has experienced "scrapes with the
law," then, is not itself "critical to the determination of
probable cause," Burke, 405 F.3d at 82, such that an officer acts
recklessly by omitting it from a warrant application.  See United
States v. Adams, 305 F.3d 30, 36 (1st Cir. 2002) (observing that
an informant's crimes not involving false statements "had at most
a remote bearing on [his] credibility" so that their omission
from a warrant application did not support a Franks challenge).

The problem here, of course, is that Lieutenant Nolet never asked Sergeant Broyer what he meant by "scrapes with the law," nor did she try to find out on her own by checking Wiggin's criminal record or, for that matter, asking him about it during the interview.  A further problem is that Wiggin's "scrapes" included a juvenile conviction for making a false report to a law enforcement officer--a crime that reflects very poorly on a witness's credibility because, obviously, it "suggest[s] the possibility that he would lie to the police" again.  United States v. Hall, 113 F.3d 157, 160 (9th Cir. 1997) (affirming the suppression of evidence seized by a warrant procured by withholding the witness's prior conviction for making a false report).

The fact remains, however, that there is simply no basis to find that Lieutenant Nolet knew, at the time she submitted her warrant application, that Wiggin had been convicted of making the false report nearly 12 years prior, when he shot himself in the leg but told police that the shots had come from across a nearby marsh.  Police records show that Lieutenant Nolet was among the many officers that reported to that call and, while Wiggin's confession that his wounds were self-inflicted was procured by another officer, it is reasonable to infer that Lieutenant Nolet would have learned of that fact by talking with other officers or, indeed, reading it in the local newspaper.  Given the very

serious nature of what Wiggin reported, and the large-scale police response, it is nearly impossible to imagine that the incident--including the fact that Wiggin's report was false--was not the subject of considerable discussion among the law enforcement community in the sparsely populated area where the incident occurred.  But there is nothing to support the further inference that, upon hearing Wiggin's name again 12 years later, Lieutenant Nolet would have remembered him as the 16-year old who had falsely reported getting shot back in 1998.[8]

None of this changes the fact that any police investigator of Lieutenant Nolet's experience and expertise could have, and should have, tried to find out what Sergeant Broyer meant by "scrapes with the law"--especially after he identified one of those "scrapes" as a felony conviction for falsifying a prescription (and further described Wiggin as a "police groupie" with past mental health problems).  Lieutenant Nolet's effort to explain why she did not do so, which comprised most of her testimony at the evidentiary hearing, raised more questions than

---

[8] This includes Lieutenant Nolet's unfortunate suggestion that the report placing her at the scene was incorrect because the officer who completed it was later dismissed for "credibility issues."  While Lieutenant Nolet appears to have offered this explanation to defend her initial recollection that she was not at the scene, it does not follow that, not only was she at the scene, but that she must have remembered that the complainant there was the same complainant who was now accusing Tanguay of possessing child pornography.

it answered.  As set forth in detail above, <u>see</u> Part I.E, <u>supra</u>,
Lieutenant Nolet claimed that she was "guided by the New
Hampshire Attorney General's law Enforcement Manual issued in
June, 2008," which she understood to say that a warrant
application need set forth "information about the credibility" of
an identified source only "[i]f there's any clear bias."  Yet:

> • Lieutenant Nolet admitted that she had not actually
> looked at the manual in preparing the warrant
> application here, and had not submitted a warrant
> application since 2007 (before this version of the
> manual was issued);

> • any defensible reading of the relevant passage from
> the manual, especially by an officer with Lieutenant
> Nolet's extensive education and experience, does not
> support her view that only the "clear bias" of an
> identified complainant serves to put his credibility at
> issue;

> • even if Lieutenant Nolet's reading of the manual were
> correct, Wiggin did harbor a "clear bias" against
> Tanguay, because (1) the two had been involved in a
> long-term sexual relationship that Wiggin had
> discontinued, based on the fact that (2) Tanguay had
> suggested, to Wiggin's disgust, that he harbored a
> sexual desire for his girlfriend's minor son, and
> (3) Wiggin's parents, with whom he had lived for his
> entire life, strongly disliked Tanguay and made no
> secret of it;

> • Lieutenant Nolet expressed a serious misunderstanding
> of what the term "bias" means, defining it at one point
> in her testimony as a "bias against telling the truth"
> and at another point in her testimony as the act of
> deceiving, rather than simply a motive to deceive; and

> • despite Lieutenant Nolet's insistence that, based on
> her understanding of the manual, she did not need to
> address Wiggin's credibility, she nevertheless stated
> in her application that Wiggin had come forward despite
> his claim that his parents and girlfriend did not know

of his homosexual activities, and explained that she
had done so to "show that he's got a lot to lose and
wouldn't be biased."

With due regard for Lieutenant Nolet's impressive
accomplishments as a police officer, the only conclusion the
court can draw from this testimony is that, following her contact
with the Conway Police Department about Wiggin, she understood
full well that his credibility was at issue, based on his felony
falsification conviction, if nothing else.  Indeed, one would
have to be unusually tone-deaf to understand Sergeant Broyer's
description of Wiggin--as a "quirky" "police groupie" who had
"scrapes with the law," including a felony falsification
conviction, and who, as a teenager, had been "troubled" and
"suicidal"--as anything other than an alert that Lieutenant Nolet
should not simply assume he was credible.  Yet Lieutenant Nolet
indulged just that assumption, and did nothing further to check
Wiggin's background (even the seemingly easy and obvious step of
asking Sergeant Lieutenant Nolet what he meant by "scrapes").

The court of appeals has held, however, that "failure to
investigate fully is not evidence of an affiant's reckless
disregard for the truth."  Ranney, 298 F.3d at 78 (quotation
marks omitted); see also United States v. Miller, 753 F.2d 1475,
1478 (9th Cir. 1985) ("It might have been prudent for the federal
agents to check on [the informant's] background and criminal
record, but their failure to do so is not reckless disregard.").

37

There is simply no evidence that--rightly or wrongly--Lieutenant Nolet knew of Wiggin's juvenile conviction for making a false report, and the other aspects of his criminal history aside from the falsification conviction, at the time she submitted her warrant application.[9]  This is fatal to Tanguay's argument that Lieutenant Nolet recklessly omitted those facts from her warrant application.  See Castillo, 297 F.3d at 26 (ruling that affiant had not recklessly omitted negative field test of substance seized from defendant's building when he "offer[ed] no evidence . . . that the negative field test had already been performed").

    That Lieutenant Nolet could have--and almost certainly should have--learned those facts before seeking the warrant does not change this result.  To rule otherwise would transform Franks into a due diligence requirement for investigators which, however desirable it might seem under the circumstances of this case, is simply not a recognized aspect of the Fourth Amendment at present.  Indeed, "to require that all potentially exculpatory evidence be included in an affidavit[] places an extraordinary burden on law enforcement officers, compelling them to follow up

---

[9]There is also no evidence that Sergeant Broyer, or the other Conway Police officer who spoke to Lieutenant Nolet about Wiggin, knew at that time of any of these aspects of his criminal history.  So the court need not consider the theory that "[a] deliberate or reckless omission by a government official who is not the affiant can be the basis for a Franks suppression." United States v. DeLeon, 979 F.2d 761, 763-64 (9th Cir. 1992).

and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded." Mays v. City of Dayton, 134 F.3d 809, 816 (6th Cir. 1998). While, under Brady v. Maryland, 373 U.S. 83 (1963), the due process clause imposes that sort of responsibility on the prosecution once a case reaches trial, "the non-lawyers who normally secure warrants in the heat of a criminal investigation should not be burdened with the same duty to assess and disclose information as a prosecutor who possesses a mature knowledge of the entire case and is not subject to the time pressures inherent in the warrant process." Mays, 134 F.3d at 816. The court cannot treat Wiggin's false reporting conviction, or any other part of his criminal history aside from his felony falsification conviction, as a reckless omission for purposes of the Franks analysis here.

## B.   Probable cause

In the case of "intentional or reckless misstatements or omissions . . . , a court owes no deference to a magistrate's decision to issue [a] warrant because, where officers procuring a warrant have deliberately misled the magistrate about relevant information, no magistrate will have made a prior probable cause determination based on the correct version of the material

facts." Burke, 405 F.3d at 82 (quotation marks omitted).
Instead, this court must "insert the facts recklessly omitted,
and then determine whether the corrected warrant affidavit would
establish probable cause." Id. (quotation marks omitted).
"Probable cause exists whenever the circumstances alleged in a
supporting affidavit, viewed as a whole and from an objective
vantage, suggest a 'fair probability' that evidence of a crime
will be found in the place to be searched." United States v.
Clark, 685 F.3d 72, 75 (1st Cir. 2012) (quoting Illinois v.
Gates, 462 U.S. 213, 238 (1983)).

Lieutenant Nolet's warrant application meets this standard,
even when the facts she recklessly omitted are taken into
account.  As the government emphasizes, Wiggin was not "an
informant from the criminal milieu" but a "citizen who [was] in
position to supply information by virtue of having been a crime
victim or witness" and, as a result, is not subject to the "proof
of veracity rules which obtain in informant cases." 2 LaFave,
supra, § 3.4(a), at 219-20.  The prevailing view, in fact, is
that "when an average citizen tenders information to the police,
the police should be permitted to assume that they are dealing
with a credible person in the absence of special circumstances
suggesting that such might not be the case." Id. at 225.  The
court of appeals agrees.  See United States v. Scalia, 993 F.2d

40

984, 987 (1st Cir. 1993) (citing United States v. Campbell, 732 F.2d 1017, 1019 (1st Cir. 1990)).

Here, though, there were "special circumstances" calling Wiggin's credibility into question, namely, his falsification conviction and history of mental instability--and it was the existence of those circumstances that Lieutenant Nolet omitted from the warrant application.  Indeed, it is generally only where the source is "a private citizen with no known criminal record or other criminal contacts, who came forward on his own" that his "story may be more easily accepted" than that of a "professional" informant.  Id. at 987 (quotation marks, bracketing, and ellipses omitted).  So, in deciding whether the application would demonstrate probable cause even had Lieutenant Nolet included these facts, the question is whether they overcome the presumption of credibility that Wiggin would ordinarily receive as a citizen coming forward to report a crime, with the result that his account of what he saw on Tanguay's computer simply could not be taken at face value.

There is little case law assessing the effect of a source's criminal record, or mental health problems, on the probable cause analysis, at least where the source is an ordinary citizen.  Even where the source is a professional informant, however, the fact that he has a criminal conviction for falsification or a similar crime of dishonesty does not mean that his account cannot

establish probable cause:  in other words, "information from dishonest informants may still provide a basis for probable cause." United States v. Patayan Soriano, 361 F.3d 494, 506-07 (9th Cir. 2004).  It is only in the absence of "additional evidence . . . to bolster the informant's credibility or the reliability of the tip" that "an informant's criminal past involving dishonesty is fatal to the reliability of the informant's information, and his/her testimony cannot support probable cause." United States v. Elliott, 322 F.3d 710, 716 (9th Cir. 2003).

Here, as the prosecution points out, Lieutenant Nolet's affidavit does set forth additional facts suggesting that, despite his prior falsification conviction and history of mental instability, Wiggin was telling the truth about seeing child pornography on Tanguay's computer.  First, while Wiggin used a false name when he initially contacted the police, he subsequently identified himself and submitted to an in-person, tape-recorded interview.  When sources have "identified themselves to the officers, [that] in itself bolsters their credibility because it opens them up for charges related to making a false report," particularly where the sources--unlike "confidential informants who are not identified in the affidavit provided to the issuing judge and who often provide information to police officers in exchange for leniency"--have "willingly

42

provided the information and received nothing in return." United States v. Croto, 570 F.3d 11, 14 (1st Cir. 2009).

Second, by reporting Tanguay, Wiggin was not implicating himself in any criminal activity, but he was revealing facts that, by his account at least, he considered highly embarrassing. Lieutenant Nolet's warrant application recounts Wiggin's expressed desire, when she initially contacted him, "to remain anonymous due to his parents and girlfriend not being aware of his lifestyle," as well as his understanding "that by making an official statement he may have to testify and the information could become public."  The application also notes Wiggin's statement that, though "it was difficult to talk about," the police "would probably find pictures of him performing oral sex on Tanguay" if they searched his digital camera.  Assuming that Wiggin was telling the truth when he said that his parents and girlfriend were unaware of his homosexual activity (and Tanguay did not adduce any evidence to the contrary), it is unlikely that Wiggin would willingly reveal that activity--and potentially jeopardize those relationships--just to make a false report against Tanguay.

This is not to say that Wiggin had no imaginable reason to level false criminal charges against Tanguay, as discussed supra. A warrant application "need not, however, entirely eliminate the risk that the informant was lying or in error" to establish

probable cause.  United States v. Capozzi, 347 F.3d 327, 333 (1st Cir. 2003).  Instead, as just noted, the application must merely "suggest a 'fair probability' that evidence of a crime will be found in the place to be searched."  Clark, 685 F.3d at 75. Lieutenant Nolet's warrant application would do so, even had it included the facts of Wiggin's falsification conviction and mental instability, because the application sets forth two powerful motives for Wiggin to tell the truth.

In this regard, this case is similar to United States v. Robinson, 546 F.3d 884 (7th Cir. 2008), where the court ruled that, even if a warrant application had included several omitted facts bearing on the credibility of the sole complaining witness, it nevertheless would have demonstrated probable cause.  There, the witness voluntarily went to the police to report that her ex-boyfriend was illegally possessing a firearm.  Id. at 886.

Though the warrant application mentioned that the witness admitted to having "outstanding warrants" against her "regarding damage to property" (capitalization corrected), it omitted the details of the incident giving rise to the charges:  the witness had gone to a hotel, where the defendant was staying with another woman and, after banging on the door to his room, "began yelling and threatened him with a knife," then followed him to the hotel office "and proceeded to bang on the office windows."  Id. at 885-86.  As a result, the witness was arrested and charged with

44

criminal damage to property and disorderly conduct, but later
failed to appear at a hearing, resulting in the issuance of a
warrant for bail jumping.  Id.  The warrant application did not
mention that development, nor did it mention that, when the
witness later had occasion to observe the defendant in possession
of the firearm, she was at his home, in further violation of the
conditions of her release.  Id. at 886.  The court of appeals
ruled that, "[a]lthough the information regarding [the witness's]
conduct at the [hotel], the resulting criminal charges, and [her]
violation of bail conditions should have been included in the
affidavit, . . . it is still the case that a named informant with
long-standing ties to the defendant provided detailed first-hand
information about the alleged crime against her own interest."
Id. at 889.  The same is true here.

Finally, the warrant application demonstrates probable cause
even accounting for the last piece of information Lieutenant
Nolet recklessly omitted--that, in the note he brought to the
interview, Wiggin wrote that Tanguay was watching "young men or
teen pornography on his laptop" when Wiggin arrived at his house.
Despite the note's equivocation on that point, Wiggin described
the content of the video in some detail during his interview, and
gave an explanation for his estimate that each of the subjects
was underage.  The affidavit sets forth Wiggin's statements on
those points, as well as his account that, shortly after closing

45

the video, Tanguay began talking of his sexual desire for
children as young as 9, and suggested that Wiggin harbored his
own sexual desire for his girlfriend's 9-year old son.  Even
adding in the statement in Wiggin's note that the video might
have shown "young men" rather than "teens," the totality of these
circumstances suggests a fair probability that one or more
subjects in the video was under the age of 18 such that it
constituted child pornography.  Cf. Syphers, 426 F.3d at 467.[10]

### III.  **Conclusion**

Because the application for the warrant to search Tanguay's
computer demonstrates probable cause that it contained child
pornography, even when clarified by the facts that Lieutenant
Nolet intentionally or recklessly omitted, Tanguay's motion to
suppress the evidence allegedly found during that search must be
denied.  As a result of this ruling, Lieutenant Nolet's
intentional or reckless conduct in withholding Wiggin's felony
falsification conviction from the magistrate will go "unpunished"
in the sense that it will have no effect on Tanguay's prosecution
here.  The same can be said of her strained efforts to defend

---

[10]Significantly, Tanguay does not argue that the warrant
application, when taken at face value, fails to establish
probable cause that the video was child pornography.  So the
court need not resolve that issue.  Assuming, as Tanguay has,
that the application demonstrates probable cause on its face,
that showing is not negated by adding Wiggin's note to himself
calling the video "young men or teen pornography."

that decision through her affidavit to, and testimony before, this court.

But Franks simply does not authorize the use of the exclusionary rule as a deterrent for even intentional misstatements or omissions in a warrant application, unless it was those misstatements that created (or, in the case of omissions, preserved) probable cause.  Indeed, prior to Franks, lower courts had held that "'[t]he fullest deterrent sanctions of the exclusionary rule should be applied to such serious and deliberate government wrongdoing.'"  2 LaFave, supra, § 4.4(c), at 549-50 (quoting United States v. Carmichael, 489 F.2d 983, 989 (7th Cir. 1973) and citing additional cases).  Franks has been criticized for the Court's failure to "acknowledge[] the existence of this body of authority," let alone "explain[] in some detail the reasons which justify a rejection of it," id. at 550, and a case of this nature lends a measure of support to such criticism.[11]

---

[11]In Stewart, the court of appeals stated that Franks, "while establishing that suppression is required when a challenged warrant is stripped of facts material to the determination of probable cause, do[es] not explicitly prohibit a court from utilizing suppression, as a matter of discretion, to serve the exclusionary rule's prophylactic purpose."  337 F.3d at 106.  The court went on to caution that "[i]f suppression were authorized in such circumstances, it would be utilized sparingly and in rare and particularly egregious circumstances"--and went on to affirm the district court's denial of the motion to suppress despite "four reckless omissions and one intentional withholding of information" and "seeming inconsistencies in the

But criticism is one thing, and controlling law is another. Under that controlling law, the evidence seized through the search warrant cannot be excluded unless the facts that Lieutenant Nolet intentionally or recklessly omitted would have negated probable cause for the search.  They would not have, so Tanguay's motion to suppress[12] must be DENIED.

   **SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  October 29, 2012

cc:  Helen W. Fitzgibbon, AUSA
     Seth R. Aframe, AUSA
     Behzad Mirhashem, Esq.
     Jeffrey S. Levin, Esq.

-------------------------

agents' testimony at the Franks hearing" because, even accounting for that information, the warrant applications demonstrated probable cause.  Id.  The circumstances here are no more egregious so, even if Stewart does authorize suppression in the case of intentional or reckless omissions that would not have negated probable cause, it does not authorize suppression here.

   [12]Document no. 34.

48